UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REHAB AMER, AHMED AMER,
and HUSSEIN AMER,

                Plaintiffs,                    CASE NO. 11-cv-11083

v.                                  PAUL D. BORMAN
                                  UNITED STATES DISTRICT JUDGE

JUDSON CENTER, INC., ELYSE FINE,
MARTHA CAREY, DENISE HARTSELL,
KIMBERLY GUNTER, and
KATHLEEN HART

                Defendants.

_____/

**ORDER**
**(1)  GRANTING DEFENDANTS' MOTIONS TO DISMISS (Dkt. Nos. 11 and 17), and**
**(2)  DENYING PLAINTIFFS' SECOND MOTION TO EXTEND TIME TO SERVE**
**SUMMONS AND COMPLAINT (Dkt. No. 32)**

Plaintiffs Mrs. Rehab Amer, her husband, Ahmed Amer ("the Amers"), and their son

Hussein Amer ("Hussein")  (collectively "Plaintiffs"), filed the instant Complaint on March 16,

2011 (Dkt. No. 1), against Defendants Judson Center, Inc. ("Judson Center"), and Judson Center

employees, Elyse Fine, Martha Carey,[1] and Denise Hartsell, and State Department of Human

Services employees Kimberly Gunter ("Gunter"), and Kathleen Hart ("Hart") (collectively

"Defendants").

The Complaint sets forth the following counts:

      1.  First Amendment Violation, Family's Right to Association and
      Unity;

---

[1]Plaintiffs have not served Defendant Martha Carey.

1

2.  42 U.S.C. § 1983, Deliberate Indifference;
3.  42 U.S.C. § 1985(3), Conspiracy to Interfere with Civil Rights;

4.  42 U.S.C. § 1983, Racial Discrimination;

5.  42 U.S.C. § 1983, Violation of the Equal Protection Clause;

6.  42 U.S.C. § 1983, Civil Rights violation: Due Process of Law, Substantive Due Process;

7.  Abuse of Process;

8.  Intentional Infliction of Emotional Distress;

9.  Civil Conspiracy; and

10.  Fraud

On May 27, 2011, Defendant Gunter filed a Motion to Dismiss.  (Dkt. No. 11.)

Defendant Hart joined in the Motion on June 22, 2011.  (Dkt. No. 14.)  On June 23, 2011,

Defendants Judson Center and Elyse Fine filed a Motion to Dismiss.  (Dkt. No. 17.)  Plaintiffs

responded to both motions on June 27, 2011, and July 25, 2011.  (Dkt. Nos. 18 and 22.)

Defendants replied on July 25, 2011, and August 5, 2011.  (Dkt. Nos. 24 and 26.)  Defendant

Denise Hartsell joined the Judson Center's Motion to Dismiss on August 24, 2011.  (Dkt. No.

28.)  The Court held a hearing on October 7, 2011.

For the reasons stated below, the Court will:

(1) GRANT both Defendants' motions to dismiss;

(2) DENY Plaintiffs' Second Motion to Extend Time to Serve Summons and Complaint; and

(3) DISMISS the action.

2

# I. BACKGROUND

Rehab and Ahmed Amer are the parents of Plaintiff Hussein Amer.  In addition, they were the parents of four other children, Mohammed Ali Amer ("Mohammed Ali"), Samier Amer ("Samier"), Suehier Amer ("Suehier") and Zinabe[2] Amer ("Zinabe").  Samier and his twin sister, Suehier, were born on November 18, 1983, with developmental abnormalities.[3]  Plaintiffs are Arab-Americans who practice the Muslim faith.

Plaintiffs' Complaint alleges that Samier, who was born on November 18, 1983, "appeared to be in constant discomfort and ate with difficulty."  (Compl. ¶ 15.)  On November 22, 1985, Samier suffered a fatal skull fracture after falling in the bathtub.  On November 24, 1985, two days after Samier's death, Defendants removed Plaintiffs' two other children, Mohammed Ali and Suehier from their home and placed them into foster care.

Samier's death was officially ruled a homicide, and Plaintiff Rehab Amer was charged with the second-degree murder of her son Samier.  The case proceeded to a jury trial in Wayne County.  Rehab Amer was found not guilty of the second-degree murder charge on August 13, 1986.

Thereafter, on December 9, 1986, Plaintiff Rehab Amer gave birth to a daughter, Zinabe. Within 24 hours of her birth, Defendants removed Zinabe from the Amers' custody and placed her in temporary foster care.

The Complaint further alleges that after the criminal trial concluded, the Amers sought

---

[2]Zinabe is also referred to as "Zeinab" in Plaintiffs' Response briefs.

[3]Plaintiffs also allege that Zinabe Amer had similar congenital abnormalities, including abnormal finger development.

the return of their children, but they faced opposition from Defendants, who refused to return the

children unless Plaintiff Rehab Amer admitted that she had murdered her son, Samier.  On

December 15, 1986, Defendant Gunter authored a report in which she stated: "It is this worker's

opinion that until Mr. and Mrs. Amer accept the fact that there was abuse in the home, no

progress will be made towards reunification."  (Compl. Ex. L, Gunter Report.)[4]

On December 16, 1987, Defendants filed a petition with the Wayne County Probate

Court requesting the permanent termination of the Amers' parental rights.  Following an

evidentiary hearing, on January 9, 1989 the Probate Court entered an order terminating the

parental rights of the Amers, finding that Samier's death was caused by child abuse.  In response

to the Amer's appeal, the Michigan Court of Appeals affirmed the Probate Court decision on

June 12, 1990, and thereafter the Michigan Supreme Court denied Plaintiffs' petition for leave to

appeal.  The United States Supreme Court denied Plaintiffs' petition for a writ of certiorari.

On September 22, 1989, Plaintiffs Rehab and Ahmed Amer filed a Complaint in the

United States District Court for the Eastern District of Michigan alleging, *inter alia*, federal civil

---

[4]The Defendant agency had previously imposed this admission-of-guilt prerequisite to family reunification in *In re Martin*, 167 Mich. App. 715 (1988); on remand from the Michigan Supreme Court for plenary consideration, *In re Martin (Martin v. Wayne Probate Judge)*, 429 Mich. 852 (Sept. 15, 1987).  Indeed, Plaintiffs' prior attorney, Richard Seid, who had represented the Amers in their previous federal court case relating to the instant matter, *Amer v. Barsamian*, No. 89-cv-72176 (E.D. Mich. filed Sept. 22, 1989), had represented the Martins in the state court appeal.  The Martins appealed successfully from a Wayne County probate court ruling that placed their child in foster care.  The Department of Social Services had petitioned to have the Martins' minor child placed in foster care due to suspected abuse.  The child's parents denied the allegations of abuse, and presented evidence by Dr. Colin Paterson, noted *infra*, that the injured child had a medical condition that made her susceptible to bone fractures -- known colloquially as brittle bone disease.  Thus, in *Martin*, the Department of Social Services, in early 1986, had contended "that a potential for reabuse existed unless and until respondents admitted responsibility for Ashley's injuries."  *Martin*, 167 Mich. App. at 719.  Accordingly, this requirement had not been applied by Defendants solely in the instant case.

rights violations: (1) denial of equal protection under the 14th Amendment, (2) denial of the fundamental right of family unity, and (3) requirement of a confession of guilt in violation of the 5th and 14th Amendments.  The Complaint, filed by attorney Richard Seid, named seven defendants, including Judson Center, the Michigan Department of Social Services and DSS Supervisor Kathleen Hart, and Wayne County probate judges Y. Gladys Barsamian, Frances Pitts, and James Lacy. The Federal Complaint also listed as "Agents of Defendants" the following three individuals who are Defendants in the instant case; Kim Gunter, Elyse Fine, and Martha Carey. *Amer v. Barsamian*, No. 89-cv-72176 (E.D. Mich. filed Sept. 22, 1989) (ECF 17).  A little over a year later, on October 5, 1990, Plaintiffs voluntarily dismissed the *Barsamian* case pursuant to Federal Rule of Civil Procedure 41(a)(2).  *Amer v. Barsamian* (ECF 32).

Mrs. Amer gave birth to Hussein on May 22, 1991.  Plaintiffs allege that, in order to avoid Defendants' immediate removal of Hussein from the Amers' custody at birth, as had happened with their daughter Zinabe, Mrs. Amer traveled to Canada to give birth to Hussein. Upon returning home to the United States, the Amers claimed that Hussein was their nephew.

On February 10, 1994, the Amers obtained x-rays that had been taken of their late son Samier, and provided them to Dr. Colin Paterson, who had testified in the *Martin* case, discussed in note 6, *supra*.  On December 9, 1994, Dr. Paterson reviewed these x-rays and Samier's other medical records, and concluded "that bone disease is much more likely than non-accidental injury as a cause of Samier's fractures in 1984."  Dr. Paterson concluded that Samier had suffered from osteogenesis imperfecta (brittle bone disease), a condition that caused Samier's bones to be very weak and susceptible to fractures.  (Compl. Ex. K, Paterson Report.)

Throughout the 1990s, the Amers continued to litigate in the Michigan state courts to

2:11-cv-11083-PDB-RSW   Doc # 33   Filed 12/28/11   Pg 6 of 18   Pg ID 432

seek reunification with their children.  The Amers sought to use Dr. Paterson's Report to re-open the Wayne County Probate Court case regarding their parental rights.  However, because the Amer children (excluding Hussein) had been adopted by others, the Wayne County Circuit Court and Probate Court concluded on June 27, 1996, that there was no jurisdiction to order a new trial.[5]  (Defs.' Mot., Ex. K, July 1, 1995 Order and Opinion of Michigan Circuit Court, *In the Matter of Mohammed Ali Amer, Suehier Amer, and Zinabe Amer*, No. 95-537685.)

In 2002, the Amers had the body of Samier exhumed so that a second autopsy could be performed.  They hired former Wayne County Chief Medical Examiner Werner Spitz to conduct the second autopsy.  Dr. Spitz concluded that Samier's death was accidental.

Thereafter, the Amers filed suit in the Wayne County Circuit Court seeking to change/amend Samier's original death certificate.  In 2006, the Wayne County Circuit Court ordered that a new death certificate be recorded reflecting that Samier's cause of death was accidental, not a homicide, legally absolving the Amers of responsibility for Samier's death, four years before the instant case was filed.  Thus, as of 2006, there was no longer any legal basis to support any action by the state/county agency to seek removal of their son Hussein, and no reason for the Amers to not assert their rights by filing a lawsuit in state or federal courts in 2006.

Plaintiffs filed the instant case on March 16, 2011, seeking equitable tolling of the statute of limitations.  Plaintiffs contend that they did not previously file a lawsuit raising the instant claims prior to Hussein's 18th birthday, May 22, 2009, due to the fear that he would be removed

---

[5]*See* M.C.L. §§ 710.51 and 710.41(2) (providing that after an order terminating parental rights is entered by the court, and upheld on appeal, entry of an order of adoption terminates the jurisdiction of the court over the adopted child or children.)

6

from the Amers' custody.

Now before the Court are Defendants' motions to dismiss on multiple grounds.  Because the Court finds the statute of limitations ground to be dispositive, there is no need to discuss the other six grounds raised by Defendants' motions including, *inter alia*, collateral estoppel, res judicata, issue preclusion, and claim preclusion.

## II.  LEGAL STANDARD

Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  "[A] civil complaint only survives a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 629 (6th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).  The Court views "the complaint in the light most favorable to Plaintiffs" and "accept[s] all factual allegations as true[.]" *Perry v. Amer. Tobacco Co., Inc.*, 324 F.3d 845, 848 (6th Cir. 2003).  However, the Court "need not accept as true 'legal conclusions or unwarranted factual inferences.'" *Id*. (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

## III.  ANALYSIS

The Complaint alleges several counts against Defendants, including constitutional claims arising under the First Amendment right to familial association, other constitutional tort claims under 42 U.S.C. §§ 1983 and 1985(3), and state law claims for abuse of process, intentional infliction of emotional distress, civil conspiracy and fraud.  Both motions to dismiss argue that all of Plaintiffs' claims are barred by the applicable statutes of limitation.  Defendant Judson Center's motion also argues that Plaintiffs' claims are barred under the *Rooker-Feldman*

7

doctrine[6] because they have been fully adjudicated in state courts. Defendant Gunter's motion argues that she is entitled to qualified immunity. The Court finds the statute of limitations issue to be dispositive, and therefore limits this Opinion to that issue.

"[T]he appropriate statute of limitations to be borrowed for § 1983 actions arising in Michigan is the state's three-year limitations period for personal injury claims." *Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005); *see also Marlowe v. Fisher Body*, 489 F.2d 1057, 1065 (6th Cir. 1973) (applying three-year statute of limitations to § 1985(3) claim). A cause of action for a constitutional violation arises when the plaintiff discovers the unconstitutional action. *Id*.

The alleged constitutional violations in this case occurred as early as 1989 and not later than the mid-1990s. Plaintiffs did not file the instant complaint until March 16, 2011. Defendants argue that Plaintiffs' claims are barred by the applicable three-year statute of limitations.

Plaintiffs concede that the three-year statute of limitations period has passed, but contend that the doctrine of equitable tolling should apply. Plaintiffs claim that they were unable to file the instant action until their youngest child Hussein had reached adulthood, due to their fear, based on Defendants' past conduct, that Hussein would be removed from their custody if Defendants learned that he was Plaintiffs' child. As noted, *supra*, Hussein turned 18 on May 22, 2009. The instant Complaint was filed on March 16, 2011.

"Statutes of limitations may be . . . excused by rules, such as equitable tolling, that alleviate hardship and unfairness . . . ." *Bowles v. Russell*, 551 U.S. 205, 219 (2007). However,

---

[6]*See District of Columbia Circuit Court of Appeals v. Feldman*, 460 U.S. 462, 483 n. 16 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923).

equitable tolling should be used sparingly, and "only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560-61 (6th Cir. 2000). Thus, the doctrine of equitable tolling applies only where there are "compelling equitable considerations" justifying its use. *Id.* at 561.

The Sixth Circuit has identified five factors to consider in determining whether equitable tolling is appropriate in a particular case:

> 1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) the plaintiff's reasonableness [in] remaining ignorant of the particular legal requirement.

*Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998). These factors are not exhaustive, however, and the Sixth Circuit has noted that "equitable tolling must necessarily be determined on a case-by-case basis." *Id.*

Plaintiffs argue that the *Truitt* factors are an inexact fit with their case, and that the Court should instead apply equitable tolling based on extraordinary circumstances. Plaintiffs assert that they failed to file their lawsuit before the statute of limitations expired because they were afraid Defendants would learn, through discovery, of the birth of their youngest child and subsequently remove him from their custody. The Sixth Circuit has allowed equitable tolling where a plaintiff fears that filing within the statute of limitations period would result in harm to the plaintiff or plaintiff's family members in a foreign nation. *See Chavez v. Carranza*, 559 F.3d 486, 493-94 (6th Cir. 2009).

In *Chavez*, Plaintiffs filed suit under the Alien Tort Claims Act ("ATCA") and the

Torture Victims Protection Act ("TVPA"), based on "torture, extrajudicial killing, and crimes against humanity in violation of the Alien Tort Statute . . . ."  *Chavez*, 559 F.3d at 490. Specifically, the complaint focused on murders, torturing and assaults while in custody of Salvadoran security forces in the 1980s.

Congress legislated a 10-year statute of limitations for the TVPA.  As to equitable tolling, the Sixth Circuit stated:

> When the situation in a given country precludes the administration of justice, fairness may require equitable tolling.  In such limited circumstances, where plaintiffs legitimately fear reprisals against themselves or family members from the regime in power, justice may require tolling.  These circumstances, outside plaintiffs' control, make it impossible for plaintiffs to assert their TVPA and ATS claims in a timely manner.  In such extraordinary circumstances, equitable tolling of TVPA and ATS claims is appropriate.

*Id*. at 493.

In *Chavez*, the Court of Appeals affirmed the district court's determination "that the pervasive violence that consumed El Salvador until March 1994 . . . justified equitable tolling of the ten-year statute of limitations."  *Id*.

In the instant case, as discussed *infra*, Plaintiffs' situation is not analogous.  In addition, further setting this case apart from *Chavez*, and further undermining Plaintiffs' request for equitable tolling, is the fact that Plaintiffs have previously brought multiple lawsuits in the federal and state court.

Defendants contend that a generalized fear of consequences is insufficient to support equitable tolling.  *See Rosenblum v. Yates*, No. CIV S-09-3302, 2011 WL 590750 (E.D. Cal., Feb. 10, 2011) (holding that inmate's fear that other inmates would retaliate against him for

10

being a "snitch" was insufficient to toll statute of limitations).  Plaintiffs contend that they have alleged a very specific fear: that Defendants would remove their youngest son Hussein from their custody if Defendants discovered that he was Plaintiffs' minor son, based on the removal of their daughter, Zinabe, from their custody within 24 hours of her birth.

Defendants contend that the Plaintiffs' subsequent case filings in federal and state courts, and subsequent appeals and requests for rehearings, undermines Plaintiffs' claim that they feared the consequences of bringing the instant legal action earlier.  Plaintiffs respond that appealing the probate court's order, or challenging it with newly discovered evidence, did not entail reopening discovery of Plaintiffs' familial situation.

Plaintiffs' counsel argued at the instant hearing on October 7, 2011, that even if an investigation into Plaintiffs' familial situation would have been ordered as a result of their continued litigation for family reunification in the state courts, Plaintiffs could have lied to state social services caseworkers, and told them Hussein was their nephew, or concealed the fact that he lived with them.  Plaintiffs' counsel reasoned that Plaintiffs could have lied with impunity in the state courts because the caseworkers would not be taking their statements under oath. Plaintiffs' counsel assumes, erroneously, that there would not be any court hearings in their litigation challenging the prior removal of two minor children based upon determinations of child abuse against the Plaintiffs.  This argument is incredulous for two reasons.  First, it assumes that the state court would have, without a hearing requiring Mr. and Mrs. Amer's presence and testimony, returned children to a couple who had previously been adjudged to have committed child abuse by the lower court and the Michigan Court of Appeals.  Most certainly, the Plaintiffs would have been required to appear in court, and been subject to further evaluation

11

and questioning.[7]  Second, for Plaintiffs' counsel to assert that his clients could lie about

---

[7]Given the clear findings of the Michigan Court of Appeals on June 12, 1990, it is not credible to advance the proposition that the children would have been returned to the Amers without live testimony at a subsequent court proceeding.  *In the Matter of Mohammed Ali Amer*, No. 114910 (Mich. Ct. App. filed Jun. 12, 1990).  The Michigan Court of Appeals, in affirming the order of the Wayne County Probate Court terminating the Amer's parental rights to their three children.  Stated in pertinent part:

> Respondents appeal as of right the order of the probate court terminating their parental rights to their three children. . . . This order was based on the probate court's finding by clear and convincing evidence that a statutory basis for termination had been established, MCL 712A.19a(e) and (f); MSA 27.3178 (598.19a (e) and (f), and that termination was in the best interest of the children.  See MCR 5.974.  We affirm.
>
> According to the records and the probate court's factual findings, this dispute started in 1984 when the Department of Social Services filed a petition with the probate court alleging abuse of Samier Amer.  Suehier Amer's four-month old twin brother.  Samier had human bite marks on both heels, neck and left side of the stomach, and also had fractures to the right humerus, the left clavicle, the left upper tibia, and the distal and middle left femur.  The five fractures were all in different stages of healing.  Samier was also diagnosed as failing to thrive.  The petition alleged that the respondents were unable to explain Samier's injuries.  Doctors did rule out any metabolic disturbances, disease or deficiency as the cause of the fractures.
>
> On March 27, 1984, an order for temporary custody of Samier was entered by the probate court.  Samier was subsequently made a temporary ward of the court after the court determined that it had jurisdiction and that the allegations made in the petition had been substantiated.  At this time, a treatment plan was designed for the parents.
>
> The parents were subsequently given a psychiatric evaluation and, at a statutory review hearing, a return of Samier to the parents' care was not recommended.  The examining doctor concluded that because the parents could not admit responsibility for Samier's condition or show concern, there could be no change in their behavior and Samier would remain at risk.
>
> At a statutory review hearing held on October 18, 1985, the same examining doctor changed his position and recommended that Samier be returned to the parents' home with continued

monitoring. The change in position was based on the doctor's assumption that the parents had accepted responsibility for their conduct even though they had never openly admitted that they had abused Samier. The probate court ordered extended visitation in the family home. One month later, on November 22, 1985, Samier was dead.

The Department of Social Services immediately filed a petition requesting the probate court to assume jurisdiction over the respondents' surviving children, Mohammed and Suehier, because of Samier's death while in his parents' care. At the hearing held on October 28, 1986, the probate court found that one of the respondents was responsible for the nonaccidental death of Samier while the other parent failed to protect the child. The court also found that the parents' decision to seek medical treatment for Mohammed three months after he started to experience chronic diarrhea was not what a rational person would do when taking care of somebody's medical needs. On October 31, 1986, the probate court entered an order making the children temporary wards of the court.

As to the circumstances surrounding Samier's death, the autopsy revealed that there was a fracture to the back of the skull and that death was caused by head injuries. The fracture was the result of a blunt force injury to the head. There was a single impact and the pattern and extent of the injuries indicated that Samier's head had been moving at a great velocity when it struck a fixed object. In the pathologist's opinion, a slip and fall in the bathtub – the explanation offered by the parents – could not have caused the injuries. The pathologist thought that Samier would have had to have been swung to generate the velocity needed to cause this type of injury because the concussion to the brain was on the opposite side of the impact. This witness's testimony was corroborated by the testimony of the director of pediatric intensive care from Children's Hospital.

As to the parents' explanation of Samier's death, the court compared the testimony of the emergency room doctor, the nurse, the police, and the EMS members with the mother's story and found numerous inconsistencies. The judge was convinced that the mother "orchestrate[d] what would sound best to the court, as opposed to what really happened." The court went on to find that one of the parents had caused the death of the child while the other failed to provide protection.

At the hearing held on December 15, 1986, the court

13

Hussein's existence/residence to caseworkers compiling a record for the court without

consequences is incorrect.[8]  Reports to the court are part of the case, and lying to the court and/or

---

decided that the children were to remain in foster care and that
family therapy was to continue with the return of the children the
ultimate objective.  All three children were not involved because
of the birth of Zinabe Ahmed on December ninth.
. . . .
[On January 9, 1989, the probate court entered its order
terminating the parental rights of Rehab and Ahmed Amer.] . . .
[T]he probate court did not terminate respondents' rights solely
because they failed to comply with the treatment plan.  The
physical abuse and death of Samier was clear and convincing
evidence of neglect sufficient enough to terminate the parents'
custody rights in the absence of any proof that this behavior would
not occur again.  The probate court found the parents unfit and
likely to remain that way after three-and-a half years of treatment.
There was clear and convincing evidence to support this finding.

*Id.* at *1-6.

[8]At the October 7, 2011 hearing on this matter, Plaintiffs' counsel argued as follows:

THE COURT: But if you wanted to re -- have a new hearing on
the termination of parental rights which is what you were seeking
back then –

PLAINTIFFS' COUNSEL: Correct.

THE COURT: -- that would require home visits by DHS.  That
would require interviews with the parties to whom the parental --
the parents because they would be receiving the children back.
Wouldn't that require the same type of investigation that you say
that they didn't want to have done?

PLAINTIFFS' COUNSEL: And I appreciate the wisdom of the
Court.  You're absolutely right, Judge.  The Court at that time
could have said, "I want to order another home study."  That is
correct.  Here is the huge and different distinction, Judge.  The
distinction is this.  The Amers, they've been hiding Hussein away
from the general -- the government and the general public as their
nephew, could easily have said this is either my nephew or

14

obstruction of justice certainly could subject Plaintiffs and their counsel to sanctions and/or prosecution. *See Brown v. Loveman*, 260 Mich. App. 576, 592 (2004) (holding that a trial court errs if it changes a child's established custodial environment without a hearing that establishes "by clear and convincing evidence that the change of domicile . . . [is] in the minor child's best interest.").

Plaintiffs have not demonstrated sufficiently compelling circumstances for the Court to equitably toll the statute of limitations. Plaintiffs could have sought the relief requested in the instant case in 2006, when the second death certificate was entered listing Samier's cause of death as accidental, without any fear of losing custody of their child Hussein, by seeking a declaratory judgment. Indeed, Plaintiffs had previously made such a request in their 1989

---

basically sent them somewhere else not for them to be discovered. Here is the great distinction though, Judge. The great distinction is that they're not testifying under oath with a court reporter there indicating that they have no other children as this question will be definitely posed on any discovery in any civil case. There's a huge difference there because one, Judge, if you're lying under oath, not only is your case basically thrown out. In a nutshell, it's been destroyed, but you have -- you could possibly be subjected to criminal charges for lying under oath. Either you lie under oath on your deposition on a general civil case as this or you basically lose your child because once the Child Protective Services or the Social Services at that time discovers you have a child, they're going to come out and take that child just like they did all the rest of your children. That was the huge distinction, Judge in that particular matter whereas hiding the child or saying the child is nephew is not a statement under oath. It's not a statement that could lead an individual that could be subject to criminal penalties, and it's not a statement that could absolutely destroy the ability of them to be with Hussein, take Hussein away from them. I think that's a huge distinction, Judge. It's an important distinction.

(Oct. 7, 2011 federal court hr'g tr. 26-28.)

15

federal case, which requested the following relief from the Court:

> Issue a Preliminary and Permanent Injunction enjoining the
> Defendants and their agents from permanently terminating the
> parental rights of the named Plaintiffs Rehab Amer and Ahmed
> Amer as to children they might have . . . .

(*Amer v. Barsamian*, No. 89-cv-72176, Compl. 19-20 (Dkt. No. 1).)

Despite seeking the above preliminary injunction, Plaintiffs elected to voluntarily dismiss their federal case in 1990, allegedly because Plaintiff Rehab Amer had become pregnant, and they were concerned that the expected child would be removed at birth if they continued their federal litigation.  However, Plaintiffs' further litigation in state court, discussed *supra*, belies this assertion.

Thus, Plaintiffs' failure to file within the statute of limitations period or by 2006 at the latest was not unavoidable.  The circumstances Plaintiffs feared certainly could have been addressed through preliminary injunctive relief or a declaratory judgment after the Wayne County Circuit Court had entered the order in 2006, amending the cause of Samier's death to accidental. Accordingly, even if the Court were to accept Plaintiffs' claim for equitable tolling based on fear of filing, that claim terminated with the entry of the 2006 Court Order.  Plaintiffs did not file the instant case until March 15, 2011, almost five years later. Further, Plaintiffs' continued and extensive litigation in the state courts undermines their argument that they were fearful that Defendants would discover that Hussein was their son and remove him from their household.  The Court therefore declines to equitably toll the statute of limitations, and will grant Defendants' motions to dismiss.

### IV.  Claims Against Unserved Defendant

Defendant Martha Carey has not yet been served in this matter, and has therefore not

joined in the Defendants' motions to dismiss.

Allowing further proceedings against Defendant Carey would be both futile and an uneconomical use of judicial resources.  The Court concludes that it will deny Plaintiffs' Motion and Second Motion to Extend Time to Serve Summons and Complaint on Defendant Martha Carey.  *See Buckley v. Fitzsimmons*, 20 F.3d 789, 793 (7th Cir. 1994) ("[N]o principle forbids a court to notice that . . . a defense exists, is bound to be raised, and is certain to succeed when raised.").  Accordingly, the Court will dismiss Defendant Carey.

## V.  CONCLUSION

For the reasons stated above, the Court will:

(1) **GRANT** Defendant Kimberly Gunter's Motion to Dismiss;

(2) **GRANT** Defendant Judson Center, Inc., and Elyse Fine's Motion to Dismiss, and

(3) **DENY** Plaintiffs' Motion and Second Motion to Extend Time to Serve Summons and Complaint on Defendant Martha Carey.

(3) **DISMISS** the action.

**SO ORDERED**.

        s/Paul D. Borman                                   
       PAUL D. BORMAN
       UNITED STATES DISTRICT JUDGE

Dated:  December 28, 2011

17

2:11-cv-11083-PDB-RSW   Doc # 33   Filed 12/28/11   Pg 18 of 18   Pg ID 444

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, December 28, 2011, by electronic and/or ordinary mail.

                                      s/Lisa Wagner   for Denise Goodine
                                      Case Manager and Deputy Clerk
                                      (313) 234-5522